1-816-61 and number 1-816-64, United States v. Sandy Hernandez-Mieses. Mr. Kastro-Lang, good morning. Good morning, Your Honor. For the record, Attorney Rafael Kastro-Lang, I represent the appellants Sandy Hernandez-Mieses. Your Honor, in this case, the main issue before the court is the legality of the search of Hernandez-Mieses' residence and two vehicles that were parked at the time of intervention at his residence. I would like to reserve three minutes for rebuttal, Your Honor. You may. Thank you. Now, a preplanned police intervention begins at the operational briefing occurring prior to arriving to the residence of the arrestee and not at the moment of the arrival of the residence. This is important because the record reveals that the arresting agents during the preintervention briefing operational plan at the police station had the express intent to conduct a search of the residence of Hernandez-Mieses because they understood that drugs, weapons, ammunition, and currency would be found there. This factual finding was made by the district court and can be seen at page 5 of his opinions. Under these circumstances, the intervening agents should have sought a search warrant since the arrest warrant does not include within its scope the search of a residence. But they could conduct a safety search in any way, could they not? Well, the safety search supposedly is an exception. It doesn't occur as a matter of course. Well, if they're searching a premise. It's supposed to be cursory. There is nothing cursory about this security sweep. And I think it's significant for the appeal, at least Appellant's argument, that when you have an illegality occurring at the inception, you cannot cure it by what occurs afterwards. But, counsel, at the inception, after they enter the house. No, this is why I emphasize, and I emphasize the preoperational plan. I understand, but I think it's, I suggest, oh, please go ahead. No, no, I didn't mean to interrupt you. Just very quickly, they get there and they see two people running from the residence. They see a gun on the dining room table. They see four cell phones. Maybe they each belong to a different individual. Who knows? So they get there and they observe things that suggest that there might be other people on the premises and they might be armed. So why doesn't what they actually see there trump whatever pre-arrest planning they had done? Why doesn't that all matter more than what was going on in terms of preplanning? Well, because I think that it's a mistake to divorce the intent to search from the inception. When you hear, this is the rare case where you have a record where it is clear that there was an intent to search from its inception. And Hardiness states clearly that a search, the reasonableness of a search depends upon the purpose for which they entered. And in this case, they entered, they had a dual purpose. To execute an arrest warrant and to search the house. Let's stop at the first one. Would you agree that they had a right to go in and arrest? If that had been the sole purpose, I would agree that then the appellant would have a problem. But this is not the sole purpose. They needed a search warrant in addition to the arrest warrant? They go in and arrest someone in the house? You go to arrest them. And in fact, as soon as they opened the door, Mieses was in the living room. They arrested him there before they ever saw any firearm in the kitchen. The people that they had seen running. They saw people running from? Outside of the house. As they went in, they saw some people running out of the house. Out of the house. And there was a gun on the dining room table. That was observed when they came back. When they came back, because they ran after the two individuals running out of the house. No one else was seen in the house. The only person that was seen was Mieses, who was immediately arrested upon entry. At the time of his arrest, no firearm had been discovered, no drugs. They went after the people that had left the house. The hot pursuit was not in the house, outside of the house. And they tried to use that to justify going everywhere in this house. When they already have accomplished the purpose of the arrest warrant. Help me with something, I may be wrong. Didn't they observe what was going on in the house before they went in? They observed two people in there. What were they doing? They were in the living room. And they locked the door so that they had to break the window in order to gain access. Yes, they broke a window and they saw the two people, Mieses in the living room in his wheelchair. The two persons ran. They come into the house, arrest Mieses, try to find the others. And when they come back, then they see in the kitchen a weapon. By that time, Mieses was already detained. The problem, as I see it, is that when you have a dual purpose, one that is legitimate and one that is illegitimate, you cannot justify what they did and ignore the illegitimate purpose of bringing the canine because they wanted to search the house. In fact, this is what they did. So the district court, in partial agreement with you, suppressed some of the evidence that was found. Well, some was suppressed. And it's appellant's position is that everything should have been suppressed. The Siena vehicle was in the cartilage of the home. By that time, Mieses was detained. What about the van? I'm more interested in the van than I am in the Siena one. Again, the van. Can you describe the van for me? Yes, it was a Ford van parked within the cartilage. It was inside the garage? Excuse me. Was it not inside the garage? Was it what? Was the van not inside the garage? Yes, it was inside. Okay. A covered garage. Right. How was it connected to the house? Oh, it's part of the house. So how was it connected to the house? I'm not talking about... Because it was built as part of the house. I have to ask you the question directly. Was there a door between the garage and the house? Yes, of course there was. In fact, they entered the carport through the residence, yes. Okay. And Collins makes clear... Can you tell me what the van looked like? It was a Ford van, white Ford van. Was it possible that it could contain people or objects inside that van? I assume that that argument could be made for any security sweep. That's not the case. Nobody was seen there. They went into the carport and nobody was there. What need was there when they already... Because the door was open. They saw two people, but they didn't know how many people were in the house that may have fled, and someone could have been there who fled through the carport, fled into the carport and locked themselves in the van. Well, Your Honor, quite frankly, you know, you can engage in all the speculation you want, but what was seen was two people leaving the house, not anyone hiding in the house. And an open door. Right. And then you go into the carport, you don't see anyone there. What need is there to open the van when you already have Mrs. half an hour before already handcuffed under the jurisdiction of the officers? See if there's anybody in there that could attack you. But let me ask you to do a little bit more speculation then. If that van had been another room, could they have looked into that room? If the man would have been... If the van, which is basically a box made out of steel, had been, instead of being a van, had been another room of the house, could they have opened the door to see what's inside? Well, if a security sweep would have been justified. Right. But here what you see is that they go in with the dog, they open bags, they open safes. It's obvious that their intent was not to make a security sweep by what they did. Their intent was to search. I'm only interested at this point in the van, which you said wasn't properly searched. And I'm asking you, if it had been another room, could they not have opened the door and looked to see if there's somebody inside? Again, it all depends on the circumstances of the case. And if, in fact, a person could be hiding there and you're going to conduct, if it's on the second floor, on the carpet, it all depends where it is, because the security sweep is not automatically justified. In this particular case, you have the defendant. He could have been removed from that house, Your Honor, within five minutes of entry. And the people they were looking for were already outside of the residence. They didn't know that at that point, did they? Well, they saw the two people run out. Does that mean that everybody was out just because they saw two people running out? Well, the only people they saw were two people going out. And an open door. Your Honor, the judge recognizes that a protective sweep should last no longer than it takes to complete the arrest and depart the premises. My God, this protective sweep lasted four hours. Four hours? Yes. They got there at 5.30 in the morning and they left at 10.30, 11. This is a case where there was an abuse of the arrest warrant and the security sweep. And this is the importance of this case, that you should not be allowed to use those principles to conduct a search of a house that required a warrant. Counsel, just very quickly about the role of the dog, which you talk about a fair amount in your briefing. As I understand it, the way this played out at the scene, that when they first entered the house, and as Judge Thompson has pointed out, the door had been locked. They had to break a window to get in. The dog did not go in at that point. The dog came in, if I understand the record correctly, the dog came in subsequently when they began to search the rest of the house for, as they would have it, to see if other people were there. And they point out that the dog could be used both to detect contraband, but also to detect the presence of other humans. So why does the presence of the dog support your assertion that this was an – there was an intent to conduct an invalid search from the very beginning? The dog served another purpose as well, did it not? Well, Your Honor, let's begin by the fact that the government agents knew Hernandez-Messis was handicapped and in a wheelchair. To find – what need was there to bring a canine when you know, due to your surveillance, that the defendant that you're going to arrest is in a wheelchair? And he was seen immediately. And the record is not as clear as you think. What happened was, in fact, I cited in my reply where the agent said that the dog tagged along during the execution of the arrest warrant, Your Honor. And obviously when they see the two people run out of the house, the first thing they did was try to catch the people that ran out of the house. That does not mean that the dog was not being used to conduct the – as part of the entry. As soon as the agent came back, the dog came in and participated in a search that, quite frankly, demonstrates an intent to search the bags. Many places where people – I heard you just say that the dog did not enter the house until the agents came back after trying to apprehend the people that were running away. They had left. The dog was not used in any way to effectuate the arrest of your client. Of course. Okay. It was being used to conduct an illegal search without a warrant. Okay. Thank you. Thank you. Mr. De Soto, good morning.  May it please the Court. Your Honor, the available articulable facts in this case gave the agents a reasonable suspicion to believe that there was another person lurking inside the home. When they arrived at 545 in the morning, they saw that the lights were on and they saw movement indicating, quote, that several individuals may have been inside. Once they punched a hole in the fiberglass of the front door and they looked through that limited view, that's when they see that at least three people are in that home, Hernandez and two others. Those two others, as the panel has mentioned, ran in an attempt to escape. Once the officers were inside the home, they noticed that right next to the dining table where Mr. Hernandez was seated in his wheelchair, there were four cellular phones. And within 10 feet of that, Your Honor, on the kitchen countertop, there was a gun. And immediately next to that kitchen countertop was an open door leading to the carport and garage area. And immediately next to that was the stairs that led to the second floor. Based on these facts, Your Honors, it was reasonable for the agents to believe that there may have been another person lurking inside that home that could pose a danger to them. And it was also reasonable to extend that search up to the second floor and, more importantly, to the garage. Why was there a reason to extend it to the automobile, whatever make it was, that was in the driveway? Not in the garage, in the driveway. Your Honor, the minivan was not part of the protective sweep. I want to be… The minivan? The minivan parked in the driveway outside the… The minivan was in the garage. Yeah. No, the cargo van was in the garage, Your Honor. The cargo van with the 1,700 kilograms of cocaine was inside the garage. What was outside the garage in the driveway? A minivan, a Toyota Odyssey, I believe. Why is that part of the protective search? The government doesn't argue that that is part of the protective search, Your Honor. You searched and you got evidence that you were introducing evidence, did you? Correct, Your Honor. We argue that it is valid under the automobile exception. Automobile exception? Yes. Does it apply to an automobile that doesn't have anybody inside? It… Yes, it does, Your Honor. It does? The automobile exception, yes. Yes, Your Honor. An automobile that doesn't have any people inside? Is it the automobile exception because the exception is because they are afraid that somebody will drive away with the evidence? Your Honor, the mobility requirement is simply that with a turn of the key it can be operational. In this case, they saw that this car, the lower part of the car and its wheels were covered in salt water, mud, sand. The hoods were hot. I know that, but that doesn't have anything to do with my question. So, Counsel, you're not trying to argue that the minivan, which was in the driveway as opposed to being in the garage, that that driveway was part of the curtilage, and so since it was part of the curtilage, basically part of the house, and they were conducting a protective sweep of the house, you're not invoking that principle at all with respect to the minivan? With respect to the minivan, we do not make that argument in the government's brief, Your Honor. However, in response to your inquiry about curtilage, the government cited at the final footnote in its brief, and the defendant appellant filed a Rule 28J mentioning Collins v. Virginia. Right. If we look at Collins v. Virginia, Your Honor, there are two important takeaways. First of all, they found that the search in that case was improper because the motorcycle was in an area, a protected area to which the officers did not have a right to intrude. And second of all, the court in Collins made a distinction between portions of the driveway that are more, that are open areas akin to open fields, and those portions of the garage, of the driveway, that have a certain structure or certain elements that demonstrate that it is more a private area. And for instance, in Collins, the portion of the garage where the motorcycle was at the moment it was searched, that area was beyond the front perimeter of the home, and it was partially enclosed. And that's why they found that that was part of the curtilage proper. In this case, Your Honor, the minivan, if we look at the pictures in the exhibits in the defendant's appendix, it's clear that that part of the driveway was completely open, and it did not, so the government's position would be that that is not part of the curtilage per se. Are you telling me that the first thing the arriving officers didn't do was block the driveway? Your Honor, it's not clear for the record what they did, but considering that 20 agents went with 10 vehicles, it's likely that they did block it, yes. Sounds like they blocked the whole street. Could be, Your Honor, yes. The agents were certainly prepared for... So how does the automobile exception fit into that scenario? Well, Your Honor, courts have said that it's not about whether the car is parked or whether it can be effectively moved. It's simply the fact that it is mobile and it's functional, and it is functional. If nobody's sitting in it, in the driver's seat, how can it be functional at that point? Because the test is, Your Honor, that you simply, at the turn of a key, that car can be turned on. Yeah, but somebody has to get in it. Nobody was in it. Sure, Your Honor, yes, but the same in Commons, where they said that the motorcycle was parked and there was no one there. That's true. And they still went in to decide whether or not, and they did not decide that the automobile exception didn't apply because of that, but rather because the agent didn't have permission. Is it your position that for the purpose of searching the car, the government merely has to establish that there was probable cause to believe that contraband could be found, that exigency doesn't matter? Exigency in the sense that the car is inherently mobile, it could be moved. You're saying that that element of exigency just doesn't matter? It's a pure probable cause analysis? Is that your position? That is the overwhelming case law, Your Honor. I know that there is some uncertainty as to the applicability, continued applicability of Coolidge, where this exigency circumstances requirement was first announced. Since then, the courts have to, first of all, the Coolidge decision was a plurality. And second of all, since then, the court itself, particularly as seen in the LeBron v. Pennsylvania or Pennsylvania v. LeBron case, they have made it clear that for the automobile exception, there is no exigency requirement. It's just a mobility and probable cause requirement, Your Honors. Well, mobility is all about exigency, isn't it? I mean, it's the fact that the vehicle could be moved that creates the exigency, the need to do the search sooner rather than later. Of course, Your Honor, yes. But it's not that high of a burden as the courts have established. I believe there is one case cited in the government's report that talks about a car that was abandoned or in a ditch, and they still found it to be mobile because of the fact that it was still operational or it appears to be operational. So what's the probable cause analysis for searching the minivan? You have to have a reasonable probability that there is contraband or other evidence of crime inside. And, Your Honors, in this case, like the cargo van inside the garage, the minivan in the driveway, the lower part was filled, had salt water, mud, sand, the hood was hot. At that point, they had already seen the other van with these characteristics, had 1,700 kilograms of cocaine inside. This all stemmed from an operation called Operation Beach Break, since the defendant was charged in a drug importation case in which they imported drugs through sea and presumably received this contraband at beaches in Puerto Rico. And so given that overall picture, I believe, as the district court determined, that there was overwhelming evidence to support a probable cause finding as to that minivan, Your Honors. And if the panel has no more questions, I'd be happy to answer any of them. But if the panel has no more questions, I would rest on the briefs. Thank you. Yes, Your Honor, Attorney Lafayette Pacho again on rebuttal. I believe that the government has miscited the case law. If you combine Coolidge, which states that you cannot search a vehicle and a residence at the Coolidge unless there's accident circumstances with Collins, that establishes that the curtilage privilege of the Fourth Amendment overrides the automobile exception, clearly in this case there was no justification to not obtain a search warrant. In fact, the record reflects that the Siena van was searched after the agent called the prosecutor. Instead of calling a magistrate, he called a prosecutor. And the prosecutor is the one that told him, search it. And then at that time, there was no mobility. The defendant was handcuffed. They took the keys that were in the house, went to the car, a car that was blocked by the agent's other vehicles. It was impossible to move it. So the mobility argument is really non-applicable in this case. And open the car with the key. All right. If you win on that point, what does that do to the rest of your case? Well, Your Honor, I have to win that, and then I have to win the plain view of the firearm in the kitchen. And I believe that the district court and the government, I'm hoping this court won't make the same mistake of ignoring the fact that from the inception, these agents wanted to search the house. And if you have a purpose, an illegal purpose, because if you want to search a house, you have to get a search warrant. So from the inception, there was an illegal purpose. When they arrived there, they already had as one of their intentions, we're going to search this house because we're going to find firearms, ammunition, and drugs. They used a warrant. Calm down. Yes. Just very quickly, counsel. I mean, I understand your focus on purpose. You cite case law. We'll look at that. But basically, the Fourth Amendment analysis is an objective reasonableness analysis. And if you look at what happened at the scene, the need to basically break into the house, discovery, seeing people run away, seeing a gun on the table in the kitchen, the four cell phones, if the judgment is made it was objectively reasonable for them to think there might be other people here and we're in danger, we're going to do this protective sweep. Doesn't that overcome any concerns about what their original purpose might have been, even if you think it was illegitimate? Isn't that what matters in the end? I would disagree because the test is totality of circumstances. If you want to divorce the fact that they, from the inception, had the illegal purpose of searching the residence without a search warrant, if you want to divorce that, you're right. My position is that when they arrived with that illegal intent, the illegality had already occurred, and according to case law, you cannot justify what you find after you make a Fourth Amendment violation. Thank you. Thank you.